# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| SUSAN HYER, | ) |
|---|---|
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-591-SLR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| | ) |
| Defendant. | ) |

Angela Pinto Ross, Esquire of Doroshow, Pasquale, Krawitz & Bhaya, Wilmington, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Alexander L. Cristaudo, Esquire, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia Pennsylvania. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, Region III and Allyson Jozwik, Esquire, Assistant Regional Counsel, Office of General Counsel, Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant

## MEMORANDUM OPINION

Dated: October $\mathcal{A}^{\int}$, 2014
Wilmington, Delaware

ROBINSON, DISTRICT JUDGE

## I. INTRODUCTION

Susan Hyer ("plaintiff) appeals from a decision of Carolyn W. Colvin, the Commissioner of Social Security ("defendant"),[1] denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. (D.I. 1) Plaintiff has filed a motion for summary judgment asking the court to remand for further proceedings. (D.I. 15,16, 20) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm her decision and enter judgment in her favor. (D.I. 18, 19) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[2]

## II. BACKGROUND

### A. Procedural History

Plaintiff filed a protective claim for DIB in April 2009, asserting disability as of January 2, 2009, because of bipolar and major depression. (D.I. 13 at 160) Her claim was denied initially and after reconsideration. (Id. at 79-84, 86-90) Plaintiff requested a

---

[1]Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

[2]Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

hearing before an Administrative Law Judge ("ALJ"). A hearing was held on October 19, 2010. (*Id.* at 34-78) Plaintiff, represented by counsel, appeared and testified. Vocational expert Tony Melanson ("VE") also testified. (*Id.* at 34-78)

In a decision dated November 8, 2010, the ALJ found that plaintiff had the severe impairment of depression with a bipolar component. (*Id.* at 21) The ALJ further found that plaintiff retained the residual functional capacity (RFC")[3] for employment and was not disabled. (*Id.* at 23-28) The Appeals Council considered plaintiff's objections to the ALJ's decision and denied her request for review on March 14, 2012. (*Id.* at 1-6) Having exhausted her administrative remedies, plaintiff filed a civil action on May 11, 2012, seeking review of the final decision. (D.I. 1)

### B. Factual Background

The record medical evidence reflects that in August 2008, at the age of 44, plaintiff commenced treatment with Deborah Bernstein, M.D. ("Dr. Bernstein"), a psychiatrist. (D.I. 13 at 280) Progress notes reveal that, at age 28 and while working as a receptionist, plaintiff experienced depression. (*Id.*) She was prescribed Trazodone[4] and resumed working some time later. Plaintiff reported feeling depressed, irritable and unable to control her emotions and spending sprees. (*Id.*) Dr. Bernstein diagnosed major depression and mood cycling with episodes of racing

---

[3]RFC is the ability to work despite physical and/or mental limitations. 20 C.F.R. § 404.1545(a).

[4]Trazodone is used to treat major depressive disorder. *See* http://drugs.com/ trazodone.html (Last visited October 6, 2014).

2

thoughts. Dr. Bernstein increased plaintiff's dosage of Effexor,[5] which was successful in decreasing plaintiff's feelings of hopelessness, but interfered with her sleep. (*Id.* at 279) Notes from September 22, 2008 indicate that plaintiff's mood was stable, with a decrease in mood cycling. (*Id.* at 279) During an October 16, 2008 appointment, plaintiff reported that her mood was "completely stable." (*Id.* at 281)

In November 2008, plaintiff started psychotherapy treatment with Joan Chatterton, RN, LCSW, CADC ("Ms. Chatterton").[6] (*Id.* at 199-206) In a bio-psychosocial evaluation form, Ms. Chatterton described plaintiff as having a "history of mood stabilization problems" and as having a depressed mood with "a high degree of irritability, poor concentration, some expressed hopelessness," with no evidence of current suicidal intent. (*Id.* at 199) Ms. Chatterton also recorded that plaintiff had two panic attacks that occurred on unspecified dates, several years prior. (*Id.* at 200) Plaintiff had problems with anxiety in some work settings, but no phobias, trauma or dissociate states were detected. Although some degree of "suspiciousness" was reported, there were no paranoid statements. Ms. Chatterton assessed plaintiff's short term memory as "impaired" and long term memory as "difficult to retrieve." She characterized plaintiff's impulse control and frustration tolerance as "poor." (*Id.* at 201) The presence of binge eating, late in the evening, resulting in a weight gain of 60-75 lbs

---

[5]Effexor is an antidepressant. *See* http://www.drugs.com/effexor.html (Last visited on October 6, 2014).

[6]According to Ms. Chatterton, Dr. Bernstein "provided the initial evaluation and continues to prescribe and actively monitor plaintiff's medications. Dr. Bernstein meets with plaintiff on a periodic basis for ongoing medication management." (*Id.* at 318) Contemporaneously, Ms. Chatterton (a registered nurse and clinical social worker) provides individual psychotherapy for plaintiff. (*Id.*)

3

was noted. (Id. at 204) Ms. Chatterton's diagnosed plaintiff with "bipolar disorder, type 1" and "major depressive disorder." She assessed plaintiff's Global Assessment Functioning ("GAF")[7] score at 52, with a past GAF of 70. (Id. at 206) Ms. Chatterton recommended a consultation with a neuro-psychiatrist for complete assessment, weekly psychotherapy sessions, and family therapy.

Dr. Bernstein's notes dated January 12, 2009 reflect that plaintiff had recently lost her job, but did not suffer any symptoms of depression and was "doing well." (Id. at 281) Dr. Bernstein recommended that plaintiff continue taking her medications and return in March for a follow-up appointment. (Id.) During a March 29, 2009 appointment, plaintiff complained to Dr. Bernstein of "mild anhedonia," with no other depression symptoms. (Id.)

Psychotherapy notes dated March 31, 2009 depict plaintiff as "very defensive" about her boyfriend and easily agitated by Ms. Chatterton's suggestion that the relationship take a slower course. (Id. at 297)

---

[7]"The GAF scale is a metric used by the American Psychiatric Association to assess an individual's psychological, social and occupational functioning." Saucedo v. Astrue, 2011 WL 3651790, at *4 (D. Del. 2011). A "GAF score of 21-30 suggests a serious impairment in communication and judgment, or a severe inability to function." McNatt v. Barnhart, 464 F. Supp.2d 358, 361 fn.3 (D. Del. 2006). "A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning." Lee v. Colvin, 2014 WL 2586935, at *2 fn. 1 (E.D. Pa. 2014). A rating between 51 and 60 on the GAF scale indicates either "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision, 34 (4th ed. 2000).

4

Progress notes dated April 14, 2009 reflect that Ms. Chatterton called several times to discuss rescheduling appointments that plaintiff had previously cancelled. (*Id.* at 298) Progress notes taken on May 4, 2009 indicate that plaintiff's depression symptoms decreased in intensity in response to an increase in the dosage of Effexor. (*Id.* at 281) In a letter dated May 4, 2009, Dr. Bernstein wrote:

> Plaintiff is a patient under my care. It is my professional opinion, that due to plaintiff's mental health disorder, she is unable to perform work-related mental activities, including activities relating to understanding and memory, sustained concentration and persistence, social interaction and adaptation.

(*Id.* at 208) During an appointment on July 7, 2009, plaintiff complained to Dr. Bernstein about a reduction in sleep and an increase in mood cycling. (*Id.* at 282) Dr. Bernstein found plaintiff "stabilized," without additional complaints.

Dr. Richard Ivins, Ph.D. ("Dr. Ivins"), a clinical neuro-psychologist, conducted a consultative psychological examination on July 8, 2009. (*Id.* at 212-15) Plaintiff reported having a "mental collapse" during a semester at college, resulting in her leaving school and returning home to work as a waitress. (*Id.* at 212) She experienced another emotional breakdown in 1992, while working for a law firm. She was diagnosed with major depressive disorder. Plaintiff reported that she had never been hospitalized for psychiatric reasons. (*Id.* at 212) She sees a psychiatrist for medication management and a nurse practitioner/social worker for psychotherapy.

As a result of the mental status examination, Dr. Ivins found that plaintiff "appeared to be quite overweight" and was fairly well-spoken during the interview. Her "stream of thinking was good and she was able to answer the questions fairly well." (*Id.*

5

at 212-13) She described having difficulty focusing and experiencing depression, which goes up and down. No delusional thinking was noted. She was oriented, with good remote and past memory recall. Plaintiff reported that her attention and concentration were mildly impaired. Her "verbal abstract reasoning was quite good, and she was able to interpret several proverbs." (*Id.* at 213) She had difficulty with math problems, especially multiplication and division. Plaintiff's stated that "her impulse control is good" and that she is now "better able to control it," however, she sometimes becomes "verbally hostile." (*Id.* at 213) Dr. Ivins concluded that plaintiff's responses seemed reliable. He diagnosed her as having major depressive disorder, recurrent, with a GAF of 50 and a guarded prognosis. (*Id.* at 213) Dr. Ivins assessed plaintiff as competent to manage her own funds.

With respect to plaintiff's functional capacity, Dr. Ivins rated plaintiff's ability to understand simple primarily oral instructions as "mild,"[8] with mild limits in carrying out instructions. (*Id.* at 214-14) He characterized as "moderate"[9] plaintiff's abilities to sustain work performance and attendance, cope with pressures associated with ordinary work, and to perform routine repetitive tasks.

Ms. Chatterton's progress notes from July 2009 reflect that plaintiff cancelled her previous psychotherapy session because she was away on vacation. (*Id.* at 299)

---

[8]"[S]uspected impairment of slight importance which does not affect ability to function." (*Id.* at 215)

[9]"[A]n impairment which affects but does not preclude ability to function." (*Id.* at 215)

6

Progress notes dated August 20, 2009 reveal that plaintiff had cancelled two appointments. (*Id.* at 275)

In a Medical Source Statement completed on August 24, 2009, Dr. Bernstein concluded that plaintiff's "mental illness interferes with her ability to carry out work-related tasks." (*Id.* at 248) Dr. Bernstein rated plaintiff's ability to carry out complex work instructions and to make judgments on complex work-related decisions as "markedly impaired."[10] Dr. Bernstein diagnosed plaintiff with "bipolar disorder- most recent episode depressed." (*Id.* at 250) She further remarked: "I feel [plaintiff] has been unable to work for quite some time, but managed to keep working until now." (*Id.*)

In an August 24, 2009 Psychiatric Assessment Form, Dr. Bernstein recorded plaintiff's chief complaint as "mood cycling with racing thoughts," sleep problems, depression and an inability to get out of bed. (*Id.* at 251) Plaintiff was reported as taking the following prescription medications: Lamictal,[11] Effexor, and Depolate.[12] (*Id.* at 251) Dr. Bernstein assessed plaintiff's attitude and behavior as appropriate. (*Id.* at 252) Plaintiff's mood was dysthymic, affect constricted and mood congruent. Her thought processes were intact and she had good insight and fair judgment. Dr.

---

[10]Listed as moderately impaired: (1) the ability to make judgments on simple work-related decisions; and (2) understand and remember complex instructions. (*Id.* at 248)

[11]Among its uses, Lamictal is used to "delay mood episodes in adults with bipolar disorder (manic depression)." *See* http://www.drugs.com/lamictal.html (last visited on October 23, 2014).

[12]One of the uses of Depakote is to "treat manic episodes related to bipolar disorder (manic depression) and to treat migraine headaches." *See* http://www.drugs.com/depakote.html (Last visited on October 23, 2014).

7

Bernstein ranked her GAF at 55. (*Id.* at 253) Dr. Bernstein concluded plaintiff "can manage her own interests but not in a work environment." (*Id.* at 254)

On August 27, 2009, Janet Brandon, Ph.D. ("Dr. Brandon") conducted a psychiatric review. (*Id.* at 255) She found the presence of "organic mental disorders" and "affective disorders." In the residual functional capacity assessment, Dr. Brandon ranked only three areas as "moderately limited,"[13] the remaining 17 were assessed as "not significantly limited." (*Id.* at 266) Dr. Brandon summarized, in part, plaintiff's functional capacity as follows:

> She has a history (remote and current) of depressive disorder but was able to perform workplace tasks throughout her employment. Field Office noted no mental problems. She is diagnosed with a learning disability which appears to be the inability to think through a problem that for her is challenging. She cannot deal with stress too efficiently. Sometimes she does not follow instructions. ADL's are independent and sustaining. Evidence in file indicates that the limitations from [plaintiff's] condition do not preclude [her] from performing simple routine workplace tasks.

(*Id.* at 268) Dr. Brandon's findings were subsequently affirmed by Pedro M. Ferreira, Ph.D, M.B.A. (*Id.* at 286)

On September 27, 2009, Dr. Bernstein composed the following letter:

> Plaintiff is a patient under my care. Plaintiff has a diagnosis of Bipolar Disorder. Plaintiff applied for disability and was rejected. In my medical opinion, plaintiff is unable to sustain substantial work of any kind, now or in the foreseeable future. Her last two employment positions ended in termination due to her illness. Plaintiff has been more stable psychiatrically while currently unemployed. I believe plaintiff would only be able to work very part-time with very frequent breaks and with many illness-related work absences.

---

[13]The three were: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; and (3) the ability to maintain attention and concentration for extended periods. (*Id.* at 266)

(*Id.* at 269)

On October 5, 2009, Ms. Chatterton wrote a letter to the Social Security Administration concerning a reconsideration of plaintiff's denial of benefits. (*Id.* at 271) She had seen plaintiff for 12 therapy sessions, up to that point, which showed emotional deregulation, mood swings, defensiveness with external blame, limited receptivity to feedback for change, compulsive overeating/compulsive shopping and low stress tolerance. (*Id.* at 270-71) She noted that plaintiff experiences "extreme mood swings during which she is either hypo-manic (forgetting appointments and becoming overwhelmed) or highly depressed (not getting out of bed, experiencing migraines and missing appointments due to inability to leave the house)." (*Id.* at 270) Ms. Chatterton stated that plaintiff's treatment had "been interrupted numerous times" due to her difficulty in addressing "numerous somatic complaints and emotions issues." (*Id.*) She opined that plaintiff "would benefit greatly" from receiving disability benefits while engaged in treatment of her mental health problems. (*Id.* at 271)

Progress notes dated October 6, 2009 suggest that, in response to an appointment cancellation in September, Ms. Chatterton discussed the importance of consistency in therapy and the need to attend all scheduled sessions. (*Id.* at 275) On October 27, 2009, plaintiff reported a decrease in hand tremors. (*Id.* at 276) Progress notes dated November 4, 2009 reveal that plaintiff's mood was "brighter and more goal directed." (*Id.*) On January 20, 2010, plaintiff cancelled a scheduled appointment. (*Id.* at 301) During a February 9, 2010 therapy session, plaintiff was feeling "useless" and hopeless. Progress notes of February 18, 2010 reveal that plaintiff was having

9

difficulty finding the correct word to express her thoughts. (*Id.* at 301) On February 28, 2010, plaintiff's difficulty with verbalization had improved. She reported that she was continuing to work out at the YMCA. (*Id.* at 302)

During a March 16, 2010 therapy session, plaintiff said she was working on starting a job search. (*Id.* at 302) Notes dated March 23, 2010 reveal that plaintiff was developing and practicing what to say to employers when calling for job opportunities. On April 20, 2010, plaintiff reported seeing Dr. Bernstein for, inter alia, an evaluation of her prescription medications. (*Id.* at 339) Ms. Chatterton observed that plaintiff was having migraines and that her affect was flat. On April 29, 2010, plaintiff indicated she was recently depressed and was sleeping during the day. (*Id.* at 340) She was concerned about her finances and was having problems sleeping. Plaintiff intended to start taking walks when the weather was good.

Progress notes dated May 6, 2010 reflect that plaintiff's sleep problems had improved, but she was feeling stressed over the prospect of her boyfriend's daughters visiting over the summer. (*Id.* at 340) On May 11, 2010, plaintiff told Ms. Chatterton about an hand injury she suffered after falling. During a May 18, 2010 therapy session, plaintiff was experiencing conflict with her mother, who was spending more time with and helping plaintiff. As a result, plaintiff felt depressed and unable to express her feelings.

On May 27, 2010, Ms. Chatterton conducted a family therapy session with plaintiff and her mother to address their problems and formulate a plan. Progress notes dated June 10, 2010 indicate that plaintiff did not appear for a scheduled appointment.

10

During a June 15, 2010 appointment, plaintiff told Ms. Chatterton that she missed the previous appointment because she forgot and "overslept." (*Id.* at 341) Plaintiff expressed continued stress over the impending visit of her boyfriend's children. At their July 8, 2010 therapy session, plaintiff said she was trying to supervise her boyfriend's children, but found it highly stressful, resulting in plaintiff retreating to bed. During an August 12, 2010 appointment, plaintiff said the children had returned to their home, but she was extremely tired.

In a Medical Source Statement dated August 25, 2010, Ms. Chatterton stated that she had 37 therapy sessions with plaintiff. (*Id.* at 321) Ms. Chatterton diagnosed plaintiff with bipolar type 1 and obesity. She assessed plaintiff's GAF at 55. (*Id.*) Ms. Chatterton found the following symptoms present: (1) poor memory; (2) appetite disturbance with weight change; (3) sleep disturbance; (4) emotional lability; (5) anhedonia or pervasive loss of interest; (6) social withdrawal or isolation; (7) decreased energy; (8) difficulty thinking or concentrating; (9) somatization unexplained by organic disturbance; (10) hostility and irritability; and (11) pathological dependence or passivity. (*Id.* at 321-322) Ms. Chatterton listed plaintiff's medication side effects as lethargy, hand tremor, slowed cognitive processing and difficulty with word finding. (*Id.* at 323) She remarked that plaintiff over focuses on medical complaints and "frequently cancels appointments due to cold/flu and migraine symptoms." (*Id.* at 323) She noted that plaintiff's mother has financial guardianship over plaintiff. (Id. at 324)

Ms. Chatterton completed a Psychiatric Review Technique form on August 25, 2010, indicating that plaintiff has mood disturbances, emotional lability and impaired

11

impulse control. (*Id.* at 326) Ms. Chatterton noted that plaintiff has moderate restrictions on activities of daily living, moderate difficulties maintaining social functioning, marked difficulties in concentration, persistence or pace in a work environment and three episodes of decompensation, each of extended duration. (*Id.* at 335)

On September 1, 2010, Ms. Chatterton wrote a letter summarizing plaintiff's psychotherapy treatment. (*Id.* at 318-320) She assessed plaintiff's current GAF at 55, and her highest GAF in the past year at 59. (*Id.* at 318) Ms. Chatterton remarked that plaintiff had extreme mood swings, with brief periods of emotional stabilization. (*Id.* at 319) She observed improvement in plaintiff's ability to identify mood changes as well as "some strengthening of her capacity to seek help with symptoms," instead of retreating to bed. (*Id.*) Ms. Chatterton added that plaintiff's progress has been "complicated by frequent interpersonal crisis and mood destabilization." (*Id.*) She noted that plaintiff is compliant with medication, attends therapy, and has accepted her diagnosis.

On October 12, 2010, Dr. Alexandra Landen, D.O., examined plaintiff for migraine headaches. (*Id.* at 342) Dr. Landon recommended switching one of plaintiff's medications in order to treat the migraines and eliminate her hand tremors.

## C. Administrative Hearing

### 1. Plaintiff's testimony

Plaintiff testified that she born on November 12, 1963 and was 46 years of age at the time of the hearing. (*Id.* at 38) She completed high school. (*Id.* at 38) She

12

weighs 242 pounds and her weight increased by 100 pounds over the previous 18 months because of the prescription medications. (*Id.* at 39) Plaintiff is unmarried and has resided with her fiancé for two years. (*Id.* at 40)

Plaintiff was last employed on January 2, 2009. Prior to that time, she worked as a receptionist starting in 1990 to June 1999 when she left to take a position as an administrative support assistant which she held until January 2007. (*Id.* at 40-41) From July 2007 to January 2009, plaintiff worked as a customer service representative. (*Id.* at 41-42) She testified about having difficulties performing her responsibilities, and struggled concentrating and dealing with the stress of the busy office. (*Id.* at 44) She reported becoming "very snippy" with her manager and co-workers, resulting in some type of "trouble" or correction. (*Id.* at 51-52) The job ended because she was not "getting things." (*Id.* at 44)

She testified that she started seeing a therapist and a psychiatrist in 2008, prior to stopping work. (*Id.* at 44-45) Plaintiff was in the process of finding a different psychiatrist because her Medicaid insurance was no longer accepted. She has been seeing the therapist, Ms. Chatterton, for over two years. (*Id.* at 45)

Plaintiff stated that she was currently unable to work because there were days that she could not get out of bed, days when she could not concentrate, and days when she just did not feel like doing anything. (*Id.* at 46) She does not have the energy to get out of bed and feels "like what's the point" when there is nothing to do. (*Id.* at 47) One of her prescription medications (Depakote) causes tremors in both hands, which interferes with plaintiff's ability to write, use utensils, hold glasses and the remote, and

13

to use zippers and buttons. (*Id.* at 46-47) Because Depakote is effective in treating plaintiff's mood swings, her doctor does not want to change the medication. Other medication side effects that plaintiff experiences are problems concentrating and blurry vision. (*Id.* at 59) Plaintiff also experiences migraine headaches and extreme fatigue. (*Id.* at 48)

Plaintiff testified that she sleeps during the day because she is unable to sleep at night due to a rapid cycling disorder, which makes her "brain hurt" because "it does not shut off." (*Id.* at 49) She watches television in bed and can remain focused on a program for about 20 minutes before using the remote to "flip the channels" to something else. (*Id.* at 50)

She avoids being around people and does very little socializing. (*Id.* at 52, 62-63) She has been in a relationship (and lived) with her fiance for two years. (*Id.* at 40) About once a month, plaintiff has lunch or does something else with a girlfriend. She admits yelling at and becoming irritated with family members. (*Id.* at 50-51) She said that she showers and gets dressed every two days. (*Id.* at 53) Plaintiff does not cook, clean, or do laundry on a daily basis. (*Id.* at 54) She cooks, mainly using the microwave. (*Id.* at 54) Her mother comes over about twice a month to assist plaintiff with house cleaning. (*Id.* at 56) She does not drive because it makes her nervous. (*Id.* at 54) She shops for groceries with her fiance.

She described "mood cycling" as going "from very up one minute and down the next minute, and it can go from pleasant to extremely unpleasant and that can happen within minutes of someone asking [plaintiff] something." (*Id.* at 57-58) She testified to

14

having destructive, unhealthy relationships with men, and being suspicious of other people. (Id. at 53, 60-61) She feels like her family blames her for her problems over which she has no control. (Id. at 61) She has not seen her 22 year old daughter for about a year. (Id. at 62) Although plaintiff's medications help, she still has mood swings. (Id. at 58-59) She has missed therapy appointments because she was not feeling well or was unable to get out of bed. (Id. at 60) She can walk 20 feet, lift 10 pounds, stand 10-15 minutes and sit for ½ hour. (Id. at 65-66)

Plaintiff further testified that she collected unemployment benefits beginning in January 2009 and represented (in unemployment benefit forms) that she was able to work full-time and that she did in fact look for work. (Id. at 67-68) After receiving notice that she should not have received unemployment benefits, plaintiff started the process of repaying those funds. (Id. at 70-71)

### 2. VE's testimony

Following plaintiff's testimony, the ALJ consulted VE Tony Melanson. (Id. at 71) In determining whether jobs existed in significant numbers in the regional and national economies that plaintiff could perform given her RFC, the ALJ posed a hypothetical question to the VE. (Id. at 72-73) In response, the VE testified that an individual with such a restricted vocational profile could nonetheless still perform a representative sample of jobs, including officer helper, security monitor, and clerical sorter, all of which exist in significant numbers in the regional and national economies. (Id. at 73-74) The VE further testified that a person who missed two days a month would be unemployable. (Id. at 77)

15

## D. The ALJ's Findings

The ALJ made the following findings:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2013.

2. [Plaintiff] has not engaged in substantial gainful activity since January 2, 2009, the alleged onset date (20 C.F.R. 404.1571 et seq.).

3. [Plaintiff] has the following severe limitations: depression with a bipolar component (20 C.F.R. 404.1520(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undesigned finds that [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except she is limited to simple routine unskilled jobs; low concentration, low memory, low stress, no decision making, limited to no production or rate work, 1 or 2 step tasks; can stand for an hour and sit for an hour alternately for 8 hours a day 5 days a week; jobs should allow avoiding fine dexterity, manipulation and little writing ability due to tremors; should avoid hazardous machinery and heights due to blurriness; and only occasional with interaction with co-workers and the public;

6. [Plaintiff] is unable to perform any past relevant work (20 C.F.R. 404.1565).

7. [Plaintiff] was born on November 12, 1963 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from January 2, 2009, through the date of this decision (20 C.F.R. 404.1520(g)).

(*Id.* at 21- 29)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether

there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir.1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir.1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner's] decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d

18

968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner's] decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his or her past work. If the claimant cannot perform his or her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262–63 (3d Cir.2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review

19

does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. Arguments on Appeal

On appeal, plaintiff contends the ALJ's decision is not supported by substantial evidence because the ALJ: (1) did not follow the treating provider rules while mischaracterizing evidence from treating sources; (2) failed to evaluate all relevant evidence; and (3) failed to properly consider plaintiff's work history. (D.I. 16, 20) Defendant counters that the ALJ properly weighed the opinions of record, considered all relevant evidence and correctly assessed plaintiff's credibility. (D.I. 19)

### 1. Treating Sources

Plaintiff first asserts that the ALJ did not follow the treating provider rules while mischaracterizing evidence from treating sources. (D.I. 16, 20) More specifically, plaintiff contends the ALJ improperly disregarded the opinions of her treating therapist

20

(Ms.Chatterton) and psychiatrist (Dr. Bernstein). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. 20 C.F.R. § 404.1527(c)(4).

A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); 20 C.F.R. § 404.1527(c)(2). The more a treating source presents medical signs and laboratory findings to support his/her medical opinion, the more weight it is given. *Id.* Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.* An ALJ may only outrightly reject a treating physician's assessment based on contradictory medical evidence or a lack of clinical data supporting it, not due to his or her own credibility judgments, speculation or lay opinion. *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000); *Lyons–Timmons v. Barnhart*, 147 F. Appx. 313, 316 (3d Cir.2005).

Even when the treating source opinion is not afforded controlling weight, it does not follow that is deserves zero weight. Instead, the ALJ must apply several factors in determining how much weight to assign it. *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008). These factors include the nature and extent of the treatment relationship, the length of the treatment relationship, the frequency of examination, supportability of the opinion afforded by the medical evidence, consistency of the

opinion with the record as a whole, and the specialization of the treating source. *Id.* If
an ALJ does not conduct this analysis, a reviewing court cannot determine whether the
ALJ actually considered all the relevant evidence, and the ALJ's decision cannot stand.
*Id.*

Considering this authority against the instant record, the court finds that the ALJ

did not err in considering the opinions from Ms. Chatterton or Dr. Bernstein. With

respect to Ms. Chatterton, the ALJ recognized that, in order to consider whether Ms.

Chatterton's (a registered nurse and licensed social worker) opinion could be accepted

and outweigh other acceptable medical source opinions, an analysis of the factors

identified in SSR 06-03p[14] was warranted. (*Id.* at 26) After applying these factors, the

ALJ concluded:

> Ms. Chatterton's opinion should be afforded little weight, as it is not
> supported by the medical evidence of record. The medical record as
> a whole shows that [plaintiff's] symptoms improve when she is in
> treatment and taking medication. Ms. Chatterton herself described
> [plaintiff's] 'symptomatic cycle.' Further, Ms. Chatterton does not
> specifically state that the claimant is unable to work.

(*Id.* at 26)

The court concludes that the ALJ's reasons for discounting Ms. Chatterton's

opinion on the basis of improvement while medicated and inconsistent symptoms is

---

[14]SSR 06-03p lists the following factors for review:
(1) how long the source has known and how frequently the source
has seen the individual; (2) how consistent the opinion is with other
evidence; (3) the degree to which the source presents relevant
evidence to support an opinion; (4) how well the source explains the
opinion; (5) whether the source has a specialty or area of expertise
related to the individual's impairment(s); and (6) any other factors
that tend to support or refute the opinion.

22

supported by the record. Since taking the medications prescribed by Dr. Bernstein, plaintiff's symptoms have improved. (*Id.* at 279, 281) During her testimony at the administrative hearing, plaintiff acknowledged that she has been compliant with taking the medications as prescribed, on a daily basis. (*Id.* at 60) She testified that Depolate helped with mood cycling and that without the medication she would be unable to function. (*Id.* at 59)

With respect to inconsistent symptoms, Ms. Chatterton's treatment notes reflect that plaintiff's mental health symptoms varied, to wit: (1) in January 2009, plaintiff did not suffer depressive symptoms after losing her job; (2) in July 2009, a therapy session was canceled because plaintiff was away on vacation; (3) in October 2009, plaintiff reported a decrease in hand tremors; (4) in November 2009, plaintiff's mood was brighter and more goal oriented; (5) on February 9, 2010, plaintiff was feeling useless and hopeless; (6) on February 18, 2010, plaintiff's problems with verbalization had improved and she was continuing to work out at the YMCA; (7) in March, 2010, plaintiff was working on a job search and practicing a speech to use when calling potential employers; and (8) in June 2010, plaintiff was having problems dealing with her boyfriend's three adolescent daughters. These notes demonstrate that plaintiff's symptoms varied and were not continuously disabling.

Turning to plaintiff's objection of the ALJ's statement that "Ms. Chatterton does not specifically state that [plaintiff] is unable to work," the court finds that Ms. Chatterton notes, letters and associated documentation reveal specific concerns over plaintiff's ability to be employed. The ALJ's decision reflects that he considered this material, as well as the entire record, in reaching his decision. (*Id.* at 26) Whether Ms. Chatterton

23

specifically stated "plaintiff is unable to work" (as noted by the ALJ) is inconsequential and has no affect on the court's conclusion that the ALJ's decision to afford little weight to Ms. Chatterton's opinion is supported by the record. Moreover, the ALJ's reasons for rejecting Ms. Chatterton's opinions were sufficiently stated to allow for judicial review. See Cotter v. Harris, 650 F.2d 481, 482 (3d Cir. 1981); Fargnoli, 247 F.3d 34 at 41; Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).

With regard to plaintiff's contention that the ALJ erred by observing that plaintiff missed appointments in October 2009,[15] the court finds that plaintiff has not demonstrated how the fact that plaintiff did, in fact, attend therapy in October 2009 would have changed the ALJ's decision or was otherwise material to the disability determination process. Shineseki v. Sanders, 556 U.S. 396, 409 (2009)[16] (the burden of showing that an error is harmful falls on the party attacking the agency's ruling)).

With respect to plaintiff's treating psychiatrist, Dr. Bernstein, the ALJ considered

---

[15]The record reflects that plaintiff attended appointments with Ms. Chatterton on October 4, 13 and 27, 2009. (Id. at 275-76) During the October 4th visit, Ms. Chatterton discussed the importance of consistency in treatment and attending scheduled appointments. On October 13th, Ms. Chatterton noted that plaintiff was more focused and goal oriented. On October 27th, plaintiff reported a decrease in hand tremors and improvement in her mood. (Id. at 275-276) Considering that these notes are more favorable to defendant's position, the court concludes that the ALJ's mischaracterization of missed October appointments did not prejudice plaintiff.

[16]The Supreme Court made clear that the "harmless error" rule that court's apply in "ordinary civil cases," is equally applicable to administrative cases. Under the harmless error rule, an error warrants remand if it prejudices a party's "substantial rights." An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the "perceived fairness, integrity, or public reputation of judicial proceedings." Sanders, 556 U.S. at 411-412. The holding applies to social security proceedings. McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011): Watts v. Astrue, No. 12-4116, 2013 WL 2392909, at *3 (E.D. Pa. June 3, 2013).

24

her opinions and afforded some weight to those restrictions that were consistent with RFC. The ALJ gave the remainder of Dr. Bernstein's opinions little weight because they were not supported by the evidence of record and her own treatment records, which establish that plaintiff's mental health symptoms were never consistently at a disabling level of severity. The record also reflects that, as the psychiatrist responsible for prescribing and monitoring the medications given to treat plaintiff's mental health symptoms, Dr. Bernstein regularly evaluated and assessed plaintiff's condition. There is nothing in Dr. Bernstein's notes to suggest that the medications were ineffective at stabilizing plaintiff.

Plaintiff further asserts that the ALJ erred by affording significant weight to the opinions of the consultative examiner (Dr. Ivins) and the state agency psychologist (Dr. Brandon). Because evidence from non-examining sources is opinion evidence that will be considered in the same manner as opinion evidence from other sources, including treating sources, the court finds no error in the ALJ's consideration of their opinions. 20 C.F.R. § 404.1527(e). Moreover, the ALJ properly evaluated Dr. Ivins' examination findings, which supported the RFC assessed to plaintiff.

## 2. Relevant Evidence

Plaintiff avers that the ALJ erred by failing to discuss plaintiff's GAF score of 50. GAF scores do not have a "direct correlation to the severity requirements" under SSA rules. *West v. Astrue*, 2010 WL 1659712, at *4 (Apr. 26, 2010 E.D. Pa) (quotations omitted). However, a "GAF score constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination

regarding a claimants disability." *Colon v. Barnhart*, 424 F. Supp.2d 805, 812 (E.D. Pa. 2006).

The record reflects that Dr. Ivins assessed plaintiff's GAF score at 50.[17] Despite assigning plaintiff the lowest GAF of record,[18] Dr. Ivins concluded that plaintiff's functional limitations did not preclude her ability to work. (*Id.* at 215) The court finds that ALJ sufficiently evaluated the material reflecting all the GAF scores "during the relevant period" ranging "from 50-55," including Dr. Ivins' report. (*Id.* at 24) Plaintiff has failed to demonstrate how the ALJ's failure to specifically discuss the GAF of 50 would have changed the outcome of the case. In light of the substantial evidence supporting the ALJ's decision, the court finds that any error was harmless. *Shineski v. Sanders*, 556 U.S. at 409.

Plaintiff next asserts that the ALJ did not consider all relevant evidence. The Third Circuit has stated that there is no requirement for the ALJ to discuss or refer to every piece of evidence of the record, as long as the reviewing court can discern the basis of the decision. *Fargnoli v. Massanari*, 247 F.3d at 42. The ALJ at bar stated that he considered all the evidence of record. *See Black v. Apfel*, 143 F.3d 383, 386 (8th

---

[17]"A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning." *Lee v. Colvin*, 2014 WL 2586935, at *2 fn. 1 (E.D. Pa. 2014). A rating between 51 and 60 on the GAF scale indicates either "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision*, 34 (4th ed. 2000).

[18]Dr. Bernstein assessed her GAF at 55 and Ms. Chatterton assessed her GAF at 52. (*Id.* at 252, 206)

Cir. 1998) (the mere failure to cite to specific evidence does not establish that the ALJ failed to consider it); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (the ALJ need not evaluate in writing every piece of evidence submitted). Having considered the ALJ's decision, it is evident that he considered all the record evidence and provided sufficient reasons for the court to discern his decision.

### 3. Plaintiff's work history

Plaintiff's final argument is that the ALJ erred by not recognizing that her testimony was entitled to substantial credibility because of her long work record. (D.I. 16 at 29) In his decision, the ALJ found "numerous inconsistencies" between her testimony and the evidence of record. (*Id.* at 27) Significantly, the ALJ referenced five reasons for finding plaintiff's subjective complaints were "not fully persuasive:"

(1) her reported improvement while in treatment and on medication;
(2) her history of depression;
(3) her ability to work for lengthy periods of time while suffering from depression;
(4) the fact that she has never been hospitalized for her mental impairments; and
(5) the lack of evidence of an emotional break since 1992.

(*Id.* at 27) The ALJ's reasons are supported by the record evidence and the court finds no reason to disturb the findings. *See Metz v. Federal Mine Safety and Health Review Com'n,* 532 Fed. Appx. 309, 312 (3d Cir. 2013) ("Overturning an ALJ's credibility determination is an 'extraordinary step,' as credibility determinations are entitled to a great deal of deference.").

## V. CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment will be denied and defendant's motion for summary judgment will be granted. An appropriate order shall issue.